**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| **Upon the relation and for the use of the** ) | |
| **TENNESSEE VALLEY AUTHORITY** ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **AN EASEMENT AND RIGHT OF WAY** ) | |
| **OVER 2.54 ACRES OF LAND MORE OR** ) | |
| **LESS, IN SUMNER COUNTY, TENNESSEE** ) | **NO. 3:11-cv-0319** |
| ) | **Judge Wiseman** |
| **LOUIS WINTERFIELD, ANDREA** ) | |
| **WINTERFIELD, JP MORGAN CHASE** ) | |
| **BANK, N.A., FIRST AMERICAN TITLE** ) | |
| **INSURANCE COMPANY, U.S. BANK TRUST** ) | |
| **COMPANY, N.A. and U.S. BANK NATIONAL** ) | |
| **ASSOCIATION, ND,** ) | |
| **Defendants.** ) | |

## REPORT OF THE COMMISSION

     This Commission appointed pursuant to Administrative Order number 75 of this Court and Rule 71A (h) of the Federal Rules of Civil Procedure to determine the issue of just compensation for the taking of the property herein condemned files the following report.

### HISTORY OF THE CASE

     1.    This case involves the acquisition of an easement and right of way (hereinafter "the easement") on 2.54 acres more or less, plus guy wire rights, in Sumner County, Tennessee. The total size of the tract from which the easement is taken, as stipulated, is approximately 43.44 +/- acres (hereinafter "the property"). The easement is dedicated by the Tennessee Valley

Authority as tract number GATN-123 on the Gallatin-Angeltown Transmission Line. It is located between points 952+52.7 and 940+52.0 approximately on that line.

2.      The notice and complaint, with property description, were filed on April 4, 2011. The order of possession, investment order and the order appointing commissioners were entered shortly after that.  The date of taking was April 4, 2011.

3.       On January 24, 2013, at 9:00 A.M., the Commission met with the parties, their attorneys and expert witnesses for a view of the property.

4.      The trial of this matter commenced on January 24, 2013 at 1:00 P.M. and was concluded that day, in Courtroom 783, United States District Courthouse, 801 Broadway Nashville, TN 37203.

5.      The property taken is described in the Declaration of Taking (Docket No. 1-1) and the attached property description, as well as in Exhibits 2, 3, and 4, the Plan and Profile Map, further identified as sheets LW-8707 (R1) and LC-129406 (R2).   (Exhibits 2, 3, and 4 will be referred to hereinafter simply as "the Plans.")

6.      Exhibit 1 entered into evidence before the Commission lists stipulations agreed upon by the parties, which are as follows:

> 1.      The date of acquisition is April 4, 2011. For purposes of determining just compensation, any valuations made as of April 13, 2011, are wholly consistent with valuations made as of the April 4, 2011, date of acquisition.
> 2.      The subject property is 43.44 acres in size.
> 3.      The easement and right-of-way acquired by the plaintiff comprises 2.54 +/- acres.
> 4.      The right-of-way is generally 100 feet in width and 1,200.7 feet in length along the centerline. The right-of-way crosses the southern and northern boundary lines at

a slight angle and is 123.32 feet and 100.3 feet, respectively, in length along the indicated boundary lines.

     5.    Two monopole transmission line structures (Nos. 178 and 179) are located in the right-of-way.

     6.    Pole 178 is 74.5 feet in height above ground and is located 298.7 feet north of the southern boundary line. Pole 178 has guy wires that are secured 39.5 feet and 47.5 feet from the centerline.

     7.    Pole 179 is 79 feet in height above ground and is located 292.7 feet south of the northern boundary line and 609.3 feet north of Pole 178.

     8.    Pole 178 is secured by eight guy wires to the pole. They are secured to the ground at four locations.

    7.  The Plans, including Pole 178, describe the underlying easement below the power lines, the topography of the land and the types of poles and guy wires located within or on the easements.

    8.  Exhibits admitted at the hearing (and the page of the transcript at which they were introduced) are as follows:

| | |
|---|---|
| No. 1 - Document titled "Stipulations" | 4 |
| No. 2 - Plan drawing, transmission line | 5 |
| No. 3 - Plan drawing showing guy wires | 6 |
| No. 4 - Plan drawing showing location of all guy wires on the line | 7 |
| No. 5 - Aerial photograph, Winterfield property | 7 |
| No. 6 - Appraisal report of Russell Parrish, IFAS | 14 |
| No. 7 - Order of reference, Stafford v. Stafford | 19 |
| No. 8 - Aerial photograph, Winterfield property, with handwritten circled area | 30 |

No. 9 - Document titled "Winterfield Property
    Improvements"       70

No. 10 - Color photograph, barn and backyard    77

No. 11-A through C - Color photographs, guy wires and
    power lines    79

No. 12 - Document titled "Exhibit to Testimony of
    Louis Winterfield"    84

No. 13 - Appraisal report, Herbert E. Phillips    114

No. 14 - Document titled "Life Expectancy Guidelines"    144

9.    The Commission viewed and walked over a large area of the property and inspected both the property and the improvements, including a single family home, fencing, possible entrances, and areas where trees had been cut. The Commission noted that the easement crosses the center of the property and takes a slight more easterly direction at Pole 177 which is the location where guy wires have been attached. At the time of the hearing the poles, transmission lines, and guy wires had been constructed.

10.    The power line has one 161,000 volt circuit of three wires with two aerial ground wires above it. There are two monopole structures on the property, which are 74.5 and 79 feet in height. There are eight guy wires extending from Pole 177, all of which are within the right-of-way.

**EVIDENCE PRESENTED AT THE HEARING**

**LANDOWNER TESTIMONY**

11.     Mr. Winterfield testified that he has lived on the property since September of 2004.  The house is in the same condition as when he and Mrs. Winterfield acquired it, except for modifications they have made.  (Mr. and Mrs. Winterfield will be referred to hereinafter simply as "the landowners," unless the context requires that either be identified by name.)  One old barn has been torn down, but the other outbuildings are the same. After buying the house, the landowners upgraded the floors and bathrooms and added a bathroom for a total of three.  They converted a garage into a kitchen, expanding its seating area, made the house handicapped accessible, and added a storm shelter.

12.     The costs of these improvements to the landowners' home are contained in Exhibit 9.  Mr. Winterfield conceded that the total cost of improvements did not necessarily equate to a dollar for dollar increase in value to the house.  However, he opined that the improvements changed the effective age of the house because of new bathrooms, plumbing and electrical work, insulation, roof straightening, and new heat pumps. He opined that the house had depreciated ten percent (10%) as of the date of taking.

13.     Mr. Winterfield valued the house at $300,000, the land at $300,000 and the barns at $40,000. (*See* Exhibits 9 and 12.).  He valued the land at $7,000 per acre based on the potential for subdividing and selling it and upon what has been done in Sumner County for similar sized

properties.  Mr. Winterfield's opinion of the value of the property before the take was $640,000. (*See also* Exhibit 12.)

14.     Mr. Winterfield was of the opinion that the marketability of his property had been affected dramatically because of the TVA easement and structures.   He believes that the taking has changed and diminished the pool of buyers, due to environmental factors and electro magnetic fields (EMFs). He opined that many younger persons would not consider purchasing the property due to the power line easement.  He opined further that the property is not able to be subdivided to the same extent it was before the easement and that the power line had destroyed the aesthetics of the property, its general character, and its salability.  The power line would be a factor in the price if he were buying it.

15.     Mr. Winterfield pointed out that Exhibit 10 showed the view from the house looking toward the power line with poles. He believes that the easement affects the use of the walking trail around the property and that the location of the guy wires affects the ability to drive a tractor through the property and to mow it with a bush hog.

16.     Mr. Winterfield opined that the value of his property as a whole had decreased from $640,000 before the imposition of the easement to $450,000 after the take, or a diminution in value of $190,000. He based this value in part on the sale of a nearby property several years back.

17.     Mr. Winterfield circled in red on Exhibit 8 the location of the road access next to Whitson Road was. He also stated that road access could be had across the dam that created the

pond. He did not believe that topography limited access to the back part of the property, because existing culverts over the creek would allow roads to access the back part of the property

18.     On cross-examination, Mr. Winterfield testified that he had purchased the property in 2004 for $288,000. Other than the house and yard, the majority of the remainder is leased to agricultural tenants. The power line is approximately 1,040 feet from the house. The power line can be seen from the kitchen, the sewing room, and the office of the house.  He agreed that the value had not increased by as much as the amount he had spent on remodeling. He testified though that he had "changed almost everything in the house."

19.     On re-direct examination, Mr. Winterfield testified that he was concerned about the height of the poles, 73 and 78 feet, because they might fall and go outside the right of way.

20.     Upon questions from the Commission, Mr. Winterfield stated that the pond was spring-fed and a year-round water source. He testified that he had looked at land sales in Sumner County and had reached the conclusion that properties the size of his are typically broken up into tracts for re-sale.  His opinion on damages from loss of view was from the line itself and because of the trees that had been cut. He also testified that he could not see a sunset without seeing the lines.

### RUSSELL PARRISH, LANDOWNERS' EXPERT

21.     The landowners next called Russell Parrish as an expert appraiser. It was stipulated that he was an expert who could express opinions as to value. Mr. Parrish inspected the property and prepared a report (Ex. 10.) His valuation was as of April 13, 2011 which was stipulated to be

equivalent to the date of take (April 4, 2011.) Mr. Parrish noted a residence, a dairy barn, and several outlying structures. He utilized the "sales comparison approach" to reach a value for the land, employing three comparable sales, and the "cost approach" to obtain a value for the structures, relying upon data from *Marshall and Swift Residential Cost Handbook.* (Hereinafter *Marshall and Swift*)

22.     The three comparable sales relied upon by Mr. Parrish were: one, the Weatherford to Hodges sale, in which 58.33 acres had been sold on June 25, 2010, for $474,720.00 or $8,139 per acre; two, the Williamson to Schinagl sale, in which 17.167 acres had been sold on November 30, 2010, for $148,500.00 or $8,650 per acre; and three, the Pearson to Thornton sale in which 18.20 acres had been sold on August 7, 2009, for $105,000.00 or $5,769 per acre. (*See* Ex. 6, pp. 45-49.) He testified that there were very limited sales of property thirty (30) acres in size and above, because those owners want to continue using their property for agricultural purposes.

23.     Mr. Parrish upgraded sales one and two, because he found them to superior to the subject and downgraded sale three, which he regarded as inferior to the subject due to less road frontage. He opined that the fair market value of the subject property on the date of taking was $6,000 per acre. (*See* Ex. 6, p. 49.) He noted the economic downturn in 2008 and noted sales after that time period had to be examined for whether they were arms length sales. Mr. Parrish testified that sales one and two were superior due to road frontage (sale one) and size (sale two). The sales were 9.40 miles west (sale one), 6.54 miles west (sale two) and 3.64 miles north (sale three) respectively. (*See* Exhibit 6, p. 48)

24.     Mr. Parrish was of the opinion that two of plaintiff TVA's expert's (Phillips's) sales were forced sales. These were the Estate of Stafford to David Thurman sale, in which 28.08 acres sold on July 8, 2010, for $47,736 or $1,700 per acre and the Estate of Stafford to Jessica Thurman sale in which 21.210 acres sold on July 8, 2010, for $36,057 or $1,700 per acre. Both were court-ordered sales. (*See* Exhibit 13, pp. 33-36 and Exhibit 7.) He noted that the purchasers were heirs of the estate and that therefore these were not arms length sales.

25.     Mr. Parrish testified that his comparable sale number three was smaller than the subject and therefore superior in size, but had less road frontage and was therefore inferior in the overall sense. He was the opinion that the value of the subject property lay between sales two and three, arriving at a conclusion of $6,000 per acre. Mr. Parrish found that the value of the property taken for the 2.54 acre easement, valued at ninety percent (90%) for the rights taken, was $13,716. (*See* Exhibit 6, p 56.)

26.     Mr. Parrish also valued the improvements, noting there had been "renovation and remodeling." He did not rely upon the amount of money the landowners had spent on remodeling, but inspected and measured the house and all improvements, arriving at an overall cost of $102.07 per square foot for the residence, or $357,667.42 before depreciation. (*See* Ex. 6. p. 53.) After depreciation, which he set at a rate of twenty percent (20%), or $71,533.48, he arrived at a final value for the house of $286,133.94. (*See* Ex. 6, pp. 51-54.)

27.     Mr. Parrish calculated the depreciation based on the "age-life method," which is in his words "very conservative." He did this because of not being able to inspect all of the

plumbing and electrical systems inside of the walls. He also valued outbuildings and reached a combined depreciated value for them of $50,002.02. Mr. Parrish's opinion as to the total depreciated value for the property and improvements was $596,775.96. (*See* Report Ex. 6. pp. 52-53.)

28.     Mr. Parrish testified that the property was damaged outside of the easement area because of the easement's being perpetual, its impact on the view, and its impact on any subdivision of the property. He found a ten percent (10%) damage to the remainder, stating that this was finding "very conservative." Given a value of the land and improvements outside the easement area, less depreciation, of $583,059.96, he concluded that there were incidental damages of $58,306.00.

29.     It was Mr. Parrish's opinion therefore that the total damages due the landowners was $72,022.00, which he rounded to $72,000.00. (*See* Report Ex. 6. pp. 3-4 and 56-57.) He based this opinion on other appraisals he had done of other TVA easements and studies of remainder sales, compiled by the Tennessee Department of Transportation (TDOT). Factors in determining incidental damages are noted on page nine of his Report at Ex.6, p.9. They include loss of use, unsightliness, and impairment of access.

30.     Mr. Parrish noted that there was approximately 687 feet in total road frontage for the subject, including areas along the road around the driveway and pond area, as well as along Whitson Road. Areas of road frontage are circled on Exhibit 8. To verify road frontage he used GIS mapping at the Sumner County Courthouse, which is geo-coded with longitude and latitude

on the courthouse retrieval system, read the deed property description, and visually inspected the property to determine road frontage.

31.     He indicated there were three to five homesites on the property before the imposition of the easement. He did not value the property as development property. He indicated people buy property to have a view.On cross examination, Mr Parrish testified that the highest and best use of the property was residential and agricultural. He did not value the property as development property, but, in his opinion, it could have been made into five acre tracts. Development is now limited now by the easement power lines and guy wires. Mr. Parrish agreed that none of the comparable sales he used were in the geographic neighborhood defined in his report. One of the comparables was 9.4 miles west, as the crow flies, not via roads. The other two were 6.54 and 3.64 miles away respectively.

32.     One factor Mr. Parrish used in comparing the properties was road frontage. He did not use the 147 foot figure for the point on Whitson Road. He used the tax map and the GIS system to help calculate road frontage, as well as visual inspection. The posts he used to calculate are in front of the road, which he pointed out on Exhibit 8. He agreed that some of the road frontage is by a pond next to the road.

33.     According to the landowners' expert witness, access to the property is currently through the landowners' driveway. The second point of access would require crossing a ravine and stream. Comparable sale number one has 2,100 feet of road frontage. Comparable sales two and three are more than fifty percent (50%) smaller and therefore superior as to price. Mr. Parrish

used his lowest comparable which he rounded to $6,000 per acre as the value for the subject, which he believed was conservative. He believed that sales one and two were superior and he used the value of sale three as the closest one.

34.     He indicated the house as inspected at the view was the same as when he inspected it for his report. He inspected the crawlspace but did not recall the attic. He used sixty years as the life of the property. He did not include in his calculations the money spent on renovations. He included in his damages a loss of lawful use, specifically subdividing the property, loss of view, unsightliness, limitation of access, and the placement of the easement as part of agricultural damages. He had reviewed all the studies but did not do a specific study for the Winterfield property.

35.     Mr. Parrish was asked about his testimony in the *Lorance* case (citation needed?) and stated he used a seven and one-half percent (7 and 1/2%) damage factor in that case. He was of the opinion that the subject property was damaged to a greater degree due to the placement of the easement, which divides the property more drastically than in the *Lorance* case.

36.     In response to questions from the Commission, Mr. Parrish testified that he used comparable sales that were some distance from the subject, because of the difficulty of finding arms length sales and sales that were similar in the same neighborhood. The sales he used were older, but were within the same economic time period, e.g., before the economic downturn.

## HERBERT E. PHILLIPS, TVA APPRAISAL EXPERT

37.      Herbert E. Phillips was allowed to testify and offer opinions as an appraisal expert without objection. His expert report is Exhibit 13. He has been an appraiser for thirty-four years and chairman of the Tennessee Real Estate Appraisal Commission. Mr. Phillips has not testified for TVA before but had done some work for them approximately twenty years before. He has worked in Sumner County and about twenty percent (20%) of his work is there.

38.      Mr. Phillip's opinion of the value of the property before the acquisition was $514,000. (*See* Exhibit 13. p. 45.)  His opinion on the value of the land itself was $217,200, which valued the 43.44 acres at $5,000 per acre. (*See* Ex. 13. at p. 43.) He used the comparable sales method of valuing the easement.

39.      Mr. Phillips used the cost approach to value improvements. He valued the improvements at $297,091.  His opinion on the total value before the taking was $514,000 and the after value $502,861, resulting in damages of $11,139, which he rounded to $11,500. (*See* Exhibit 13, pp. 45-54.). His distances to comparable sales are driving miles, which are, respectively, 1.1 miles to sales 1. and 2., 5.1 miles to sale 3., and 2.8 miles to sale 4.(Ex. 13., p.32.)

40.      Mr. Phillips relied upon four comparable sales, which are discussed in his report. (Ex. 13. pp. 33-40.)   Sales one and two in Mr. Phillips' report were chancery court sales, but this fact did not change his opinion that they were fair market value sales, because they reflected an increase in value during the sales process. Mr. Phillips also called the buyer on one of the chancery sales to verify that the sale had been an arm's length sale.

41.     TVA's expert witness further testified that even if the road frontage used in the Parrish report were correct it would not have affected Phillips' opinion of value for the property. He adjusted sales one, two, and three down for size, because smaller tracts tend to get a higher price per acre. He also considered the actual ability to ingress and egress the property in addition to road frontage. He limited his road frontage estimate based on the pond, the TVA maps and the deed. He stated that even if there were fifty (50) feet of road frontage on Whitson road at the point it would not change his opinion of value, which was $5,000 per acre for a total land value of $217,200.

42.     Based on driving distances, Mr. Phillips opined that Parrish's sale one was 15.2 miles away, using Google maps and driving it, sale two 9 miles away by driving distance, and sale three 7.1 miles away by driving distance. He was of the opinion that Mr. Parrish's sale three was not comparable due to its having drainage fields and development activities.

43.     Mr. Phillips identified the relevant neighborhood of the property as South of Highway 52, East of Dobbins Pike, West of Highway 31, and North of the Gallatin city limits.

44.     In arriving at the value for the house, TVA's expert performed an inspection. He inspected the crawlspace and the attic, where he noted that there were additional supports. He measured the house and noted the number and size of the rooms. He opined that the life of the property was 55 years based on *Marshall and Swift* and that the effective age of the house was fifteen (15) years. His cost analysis of improvements (Ex. 13, pp. 44-45) showed a base cost of $93.14 per square foot and a total depreciated value of improvements of $297,091.

45.    In analyzing the easement itself, Mr. Phillips noted it was about 1,200 feet long and 100 feet wide. He noted the loss of trees cut and guy wires. His assessment for loss of trees is included in his damages to the right of way of the easement. The wooded area where the trees were cut was about 400 feet of the 1,200 foot right of way length. He also factored this into his selection and assessment of comparable sales. Thus, Mr. Phillips' opinion as to the per acre value included the value of trees on wooded property. (*See* Ex. 13, at p 48.)

46.    In explaining his finding that there was no damage to the remainder, Mr. Phillips noted that corn could be grown around the poles and that the house was 973 feet from the easement. With respect to the issue of aesthetic harm, he noted that the line could be seen from the east side of the house, but not from the front.

47.    TVA's expert witness did not believe generally that it was appropriate to rely on highway studies to determine the damages to remainders from power lines.  In evaluating whether there were damages to the property, he considered lot sales in Somerset Downs development in Sumner County.  In that comparison, he considered the impact of power lines that were three hundred (300) feet from the residential uses. (Ex. 13, pp. 50-51.)  Based upon that comparison, he opined there was no impact on the landowners' value from the easement and structures. He thus found no damages outside the easement area and limited the damages to the valuation of the easement itself at ninety percent (90%)--for total damages of $11,500.

48.    On cross examination, Mr. Phillips testified that he had completed two previous appraisals for TVA. He has done conservation easement appraisals for land owners and highway

department appraisals in condemnation cases. He has also testified in a park service case in Rutherford County. Mr. Phillips stated that appraisals are judgments based on facts and data, but that experience is also important. He agreed that the economy had been in a lull since 2008 and that it was hard to find comparable sales.

49.     Mr. Phillips thought that real property values in the relevant market had increased in general value by (2%) or three percent (3%) in 2010, but that there were "quite a few" distressed sales where property was sold under duress. He is of the opinion that exposure and advertising are important to get the best price for property. He has not been involved in a chancery court sale of property, but is of the opinion that "not a lot" of advertising goes into the sale and that it is a cheap way to sell real estate. He does not know how much advertising there was of the comparable sales he used that were chancery court sales. He was not aware the price in chancery court sales could be raised after the final bid.

50.     Mr. Phillips believed that sales one and two in his report were for fair market value based on talking to the buyer, but in hindsight conceded that these sales did not deserve as much weight and he would probably not have used them.  He thought the wooded and open areas of the subject were a positive feature for the property. His comparable sale three had more wooded area as did his comparable sale four.  Mr. Phillips testified that the value of property was enhanced if more land were cleared.

51.     At the time of Mr. Phillip's report, he did not believe there was available road frontage at the point on Whitson Road. (*See* Ex. 8 with circled area.) He did not think the easement as it was located was burdensome or intrusive.

52.     Returning to the issue of damages to the remainder, Mr. Phillips agreed that Somerset Downs was a large subdivision in Hendersonville, but insisted that whether the property was urban or rural was not a factor in his opinion on incidental damages. He stated that the most important aspect of value of the subject property was the house itself, where the home sits and the pond.  He opined that the view was only important in the front of the house. He thought the value of of a house in the Somerset Downs development was because of its location. He thought damages within the easement compensated for any tre cutting outside the easement. He agreed the renovations the Winterfields had done would lower the effective age of the house but he gave it an effective age of fifteen years. In his comparable sales study he did not find a rural farm where there was an easement. He saw no potential uses for the subject except agriculture in the forseeable future. He indicated that if there were fifty feet of road frontage at the access point on Whitson Road it would not change his valuation because of the ravine that would have to be crossed. His opinion of highest and best use for the property was that it was agricultural other than the house. He stated there was insignificant damage at a distance of three hundred feet. He opined there was no damage to the view from the taking of trees either within or without the easement area. He agreed that if a tree outside the easement area may fall within five feet of the line it may be cut.

## ANALYSIS AND DISCUSSION

53.     The appropriate amount of damages due to a landowner in a TVA case is the difference between the fair market value of the whole tract before and after the taking. *See United States of America ex rel. TVA v. Easements and Rights of Way over 6 Acres of Land*, 117 Fed. Appx. 422 (6th Cir. 2004) *citing United States of America v. 2847.58 Acres of Land,* 529 F.2d 682, 686 (6th Cir. 1976).

54.     The assessment of damages has two parts, using the method allowed in the *Instructions to Commissioners*, 61 F.R.D. 503: assessing the damage to the land covered by the easement itself and adding incidental damages, if any.

55.     Below is a table summarizing the opinions of the property owner and the expert appraisers:

| Appraisers/ Landowner | Winterfield Landowner | Parrish Expert | Phillips Expert |
|---|---|---|---|
| Highest and best use | Residential | Agricultural/ Residential | Agricultural w/one single family residence |
| Value per acre | $6,900/acre | $6,000/acre | $5,000/acre |
| House/improvements value | $300,000 | $336,196 | $297,091 |

| | | | |
|---|---|---|---|
| Overall value of house/prop. | $640,000 | $596,776 | $514,000 |
| Percent of damage | 29.68% to the whole | 90%/easement 10%/ remainder | 90%/easement |
| Damage to easement | | 13,716 | 11,500 |
| Incidental damage | | $58,306 | 0 |
| Property as a whole | $190,000 | | |
| Amount due owner | 190,000 | 72,000. | 11,500 |

56.     Thus, on the issue of the total amount due the landowners the witnesses ranged from $11,500.00 to $190,000.  The property owner testified to total damages of $190,000.  Mr. Parrish found overall damage of $72,000. Mr. Phillips found damages of $11,500. The differences involved the underlying value of the property, including the improvements, and the existence and extent of incidental damages.

57.     All appraisal experts used the sales comparison approach to evaluate the property. "[C]omparability is a function of three variables: the respective characteristics of the properties, their geographic proximity to each other, and the closeness in time of the sales." *See United States v. 68.94 Acres of Land, 918 F.3d 389, 399 (3d Cir. 1990)* 918 F.2d 389, 399 (3d Cir 1990).

58.     The Commission notes that Mr. Parrish used the Pearson to Thornton sale, in which 18.20 acres sold on August 7, 2009, for $105,000.00 or $5,769 per acre. (*See* Ex. 6, pp. 45-49).  In the opinion of the Commission, this sale comes closest to meeting the requirements for comparability.

59.     The Pearson to Thornton sale is 3.64 miles from the subject, closer than the other comparable sales cited.  It is superior in size, inferior in frontage (90 feet as compared to 637 feet), similar in topography, zoning and utilities, but from an overall standpoint, inferior. The zoning is the same as the subject. The physical characteristics are similar to the subject.  Both are described as "rolling".

60.     The Commission was persuaded by Mr. Parrish's testimony on the issue of the value of the land--$6,000.00 per acre.  The Commission credits that value based on Mr. Parrish's reliance on the Pearson to Thornton sale and the general cogency of that portion of his opinion. All appraisers agree that the evaluation of the land within the easement should be damaged at 90% of fee value.

61.     The Commission is not required to accept either the high or low testimony, but may form its own judgment as to the total loss occasioned by the take.  The Commission must be realistic and make its judgment as to what testimony is realistic.  *See U.S. ex rel. TVA v. Easement in Logan County, Kentucky*, 336 F.2d 76, 80 (6th Cir. 1964), *on remand* 246 F. Supp. 263, *aff'd* 375 F.2d 120 (6th Cir. 1967). Testimony which is unreasonable and would, to the Commission's own knowledge, be inconsistent may be disregarded. *See Instructions to Commissioners*, 61

F.R.D. 503, at 507-508. The fair market value for the highest and best use of the property is the generally accepted standard for determining "just compensation" if the property is taken by condemnation. *See United States v. 1,291.83 Acres of Land*, 411 F.2d 1981 (6th Cir. 1979).

62.     Turning to the issue of possible damages to the remainder, it was necessary for both appraisers to also consider value of the improvements. Both appraisers used the cost approach to the valuation of the improvements. Their differences centered around the effective age and remaining economic life of the improvements, with Mr. Parrish finding an effective age of ten (10) years with depreciation of twenty percent (20%) and Mr. Phillips finding an effective age of fifteen (15) years with a depreciation of twenty-seven percent (27%). This difference in opinion on effective age resulted in a difference in the experts' valuation of the improvements-- $336,136 for Mr. Parrish as compared to $297,091 for Mr. Phillips, a difference of $39,045 or approximately twelve percent (12%).

63.     Mr. Parrish found incidental damages of $58,306 based on an opinion of ten (10%) percent damage to the remainder of the property. Mr. Phillips found no incidental damages. The landowner, Mr. Winterfield, believed that he had incurred damages to the property as a whole of $190,000.

64.     Any award of damages for loss of value is to be based on the fair and reasonable value of the property as a whole. *See Instructions to Commissioners*, 61 F.R.D. 503, 514 *citing United States v. Myer*, 113 F.2d 387 (7th Cir. 1939), *cert. denied*, 311 U.S. 706, 61 S.Ct. 174, 85 L.Ed. 459 (1940). Testimony which is unreasonable and would, to the Commission's own

knowledge, be inconsistent, may be disregarded. *Id.* at 507-508.

65.     The landowner had the burden of proving the fair market value of the condemned land. *United States ex rel. and for Use of T.V.A. v. Powelson, 319 U.S. 266, 273, 63 S.Ct. 1047, 87 L.Ed. 1390, 1396-1397 (1943); United States v. 1291.83 Acres of Land, 411 F.2d 1081, 1084 (6th Cir. 1969).*

66.     The Commission participates in a view for a reason. The reason is to "enable them (Commissioners) to better understand and weigh testimony which they hear." The Commission may 'take into consideration what you (Commissioners) will see on the view; and you will base your awards on both the view and the testimony you will hear." *See Instructions*, p. 3. The Commission was able to see at the view the areas where there was road frontage or not, including the claimed point of access on Whitson Road, the effect of the loss of trees, the view of the power lines from the house, the dam forming the pond, the pond itself, fences, and the existence of guy wires within the easement and other factors.   The Commission is of the opinion that there was some incidental damage to the property due to the location of the lines and poles and aesthetic harm from damage to the view.

67.     A landowner's testimony as to the value of his property is not always sufficient testimony on which a verdict can be based.  There must be a basis for the landowner's valuation. When the landowner's own testimony shows that her valuation has no probative value, the court may determine that the landowner's testimony alone is insufficient to support a jury verdict. *Sowards,* 370 F.2d at 92 ("[W]here the presumption of the owner's special knowledge is negated

by his own testimony, his opinion has no probative value and is insufficient to sustain the award."); *see also Kestenbaum,* 514 F.2d at 698-99; *Klapmeier v. Telecheck International, Inc.,* 482 F.2d 247, 253 (8th Cir.1973). A landowner's opinion must have probative value and have a relationship to market value. *United States v. 901.89 Acres of Land*, 436 F.2d 395, 399-400 ( 6th Cir., 1970) *citing United States v. Trout*, 386 F.2d 216, 223, n. 10 ( 5th Cir. 1967).

68.     Here, the landowner had some knowledge of land sales in the area. However, the landowner's testimony as to damages to land value was not consistent with the damages found by the various appraisers. Although the landowner's testimony has weight as noted in the *Instructions*, the Commission is not required to accept it. The landowner relied on no particular comparable sales or other market information or special knowledge or expertise in real estate to substantiate his opinion.  Hence, the Commission cannot credit that portion of the landowner's testimony that was completely inconsistent with the appraisers' testimony. The landowner did not break down his opinion as to the value and damage to improvements in a clear way so that the Commission could get a true understanding and appreciation of his reasoning.

69.     For the value of the house, the Commission credits Mr. Parrish's testimony of $336,136.   The Commission was persuaded by his opinion and also by its own inspection of the house during the view that Mr. Parrish's testimony as to the effective age of the improvements and their remaining useful life was fairer and more reasonable than that of TVA's appraisal expert. The Commission did not see any evidence of the roof weakness or moisture that were the foundations of Mr. Phillips' lower valuation of the house.

70.    As stated above, the Commission also credits Mr. Parrish's underlying value of $6,000.00 per acre for the property.  Two of Mr. Phillips's comparable sales were clearly not arms length sales. The most comparable sale he used in his estimation of value, the Williams to Kimes sale (comparable three) was inferior in road frontage and percentage of land cleared. Comparable sale three was also a significant distance away, i.e., 5.1 miles, lending credence to the idea that comparable sales were difficult to find in the area of the subject.

71.    Mr. Parrish found that the total damages to the remainder were ten percent (10.0%) of the value of the property, or $58,306.00.   Mr. Parrish admitted that there were no studies comparing two identical pieces of property where one had a power line easement and the other did not.  He based his opinion on his years of experience and talking to other developers and buyers. He said there was no study that replicated this property's damages.

72.    During Mr. Phillips' testimony and in his Report (Ex. 13, p. 51.) he discussed an article from the *Appraisal Journal* [1]. The Commission notes the following portion of that article:

> Over time, there is a consistent pattern with about half of the studies finding negative property value effects and half finding none.
>
> When effects have been found, they tend to be small; almost always less than 10% and usually in the range of 3%-6%.
>
> Where effects have been found, they decay rapidly as distance to the lines increases and usually disappear at about 200 feet to 300 feet (61 meters to 91 meters).

---

[1] Chalmers and Voorvart, "High Voltage Transmission Lines: Proximity, Visibility, and Encumbrance Effects," *Appraisal Journal*, Summer 2009, p. 227, cited at Exhibit 13, Phillips Report, p. 51.

Two studies investigating the behavior of the effect over time find that, where there are effects, they tended to dissipate over time.

There does not appear to have been any change in the reaction of markets to high-voltage transmission line proximity after the results of two widely publicized Swedish health-effects studies were preliminarily released in 1992.

These general conclusions have characterized the appraisal and economic literature throughout the last twenty-five years, and there do not appear to be any new or different trends in research.

73.     The Commission has carefully considered the references to a study of Somerset Downs made in Mr. Phillips' Report (Ex. 13, pp. 50-53) and the lot sales relied upon by Mr. Phillips in this case, but finds that they either deal with properties that are not comparable to the subject or have analytical flaws.[2]  Ultimately, the question in this case and every case is not whether power lines and structures tend to damage residential value generally in higher density suburban developments, but whether the lines have diminished the value of the property in the case before the Commission.

---

[2]   The Commission notes that the Somerset Downs Study (Study 2) concerns "an upscale subdivision north of Hendersonville." It is difficult for the Commission to see how exactly this compares with a forty-three acre residential/agricultural property in the country several miles north and west of Gallatin.  The Commission notes that Mr. Phillips also  references twenty-one lots sold together with "an equivalent lot price of $79,900 on page 51 of Exhibit 13. Clearly from this some lots sold for more and some for less. At least five of those lots adjoined the easement and it is not clear what their unit price was. Clearly some lots had to sell more land for less per acre to get the same amount, $79,900, per lot as for unencumbered lots. Even under Mr. Phillips's description the view lot sale is at the edge of what the *Appraisal Journal* article sets as the outer limits of negative value effects. From reviewing the pictures of lots in Somerset Downs and the plat map it is apparent that the Winterfield property is not in a comparable situation. For these reasons the Commission gives Mr. Phillips's residential study of Somerset Downs less weight.

74.     To summarize, for the damage to the easement itself the Commission accepts the opinion of all appraisers of ninety percent (90%) damage to the exact land covered by the easement itself.

75.     On the issue of damages to the remainder, the Commission's award of loss of value is to be for the fair and reasonable value of the property as a whole. *See Instructions to Commissioners*, 61 F.R.D. 503, 514 citing *United States v. Myer*, 113 F.2d 387 (7th Cir. 1939), cert. denied, 311 U.S. 706, 61 S.Ct. 174, 85 L.Ed. 459 (1940).  Testimony which is unreasonable and would, to the Commission's own knowledge, be inconsistent, may be disregarded. *See Instructions to Commissioners*, 61 F.R.D. 503, at 507-508.  The Commission has pointed out, in paragraphs 67-69, the reservations it has about accepting the landowner's testimony on the value of his property and on total damages.

76.     The Commission does agree that there is damage from the public apprehension of power lines, as noted in *Hicks, supra*.  Likewise the Commission may consider as damage the unsightliness of towers and transmission lines in the locality as well as changes in the character of the ground which arises from such clearing. *See U.S. v. Robertson*, 354 F.2d 877, 880-81 (5th Cir. 1966).

77.     The house in this case is 973 feet from the power lines and poles.   The development of the property through the access on Whitson Road at the corner would involve expense and topographic difficulty, regardless of the power lines and structures. Nonetheless the Commission is of the opinion that the property could be sold in plats of five (5) acres or more.

Such development is made more difficult due the presence of the easement. Trees have also been cut, which would affect the view.

78.    The size, scope and visual impact of this power line, as observed at the view, as documented by the photographs in evidence and as explained and described by the witnesses is significant enough that the Commission cannot conclude that there is no damage at all to the remainder.. The easement is through the middle of the property. Significant numbers of mature trees were cut affecting the view. Although the easement is 973 feet distant from the house it is still viewable from the house and certainly from many other parts of the property.

79.    The Commission relies generally on guidance from the case law that there may be a diminution of value to the property based on "apprehension of injuries to person or property by the presence of power lines on the property (which) is based on practical experience and may be taken into consideration in so far as the lines and towers affect the market value of the land." *See Hicks v. United States for the use of the Tennessee Valley Authority*, 266 F.2d 515, 520 (6th Cir. 1959).

80.    The Commission concludes, based upon all of the evidence, including the testimony of the landowners and the experts and the reports and studies relied upon by the latter that the remainder has been damaged to the extent of three percent (3%). That amounts to three (3%) percent of $583,059.96 or $17,491.80 in incidental damages.

81.    Based upon all of the evidence produced at the hearing on this matter, aided by personal examination of the property in the presence of the parties and their attorney, the

Commission is of the opinion that the calculation of damages, as of the date of taking, is as follows:

| | |
|---|---|
| Damages to the area of the easement itself | $13,716.00 |
| Incidental damages to the area outside the easement | $17,491.80 |
| Total damages | $31,207.80 |

82.     Hence, the Commission respectfully reports that the just compensation due the landowner(s) is $31,207.80.

Respectfully Submitted,


/s/ Jack W. Derryberry, Jr.
Chairman

/s/ Horace Johns
Commissioner

/s/ Douglas Berry
Commissioner